RECEIPT #_____
AMOUNT $_____
SUMMONS ISSUED_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE_____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2003 DEC -9  A 10: 02

U.S. DISTRICT COURT
DISTRICT OF MASS.

| | |
|---|---|
| JAMES P. SLAVAS, On Behalf of Himself And All Others Similarly Situated, | **CASE NO.** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| ALKERMES, INC., RICHARD F. POPS, ROBERT A. BREYER, DAVID A. BROECKER, MICHAEL J. LANDINE, JAMES M. FRATES, and JAMES L. WRIGHT, | **03 - 12471 RCL** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

MAGISTRATE JUDGE_Collings_

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned

attorneys, upon personal knowledge as to himself and his own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which

included, among other things, a review of the public documents and announcements made by

Defendants, Securities and Exchange Commission ("SEC") filings, and press releases regarding

Alkermes, Inc. ("Alkermes" or the "Company"), alleges, for his Complaint, as follows:

## SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of all purchasers of the common stock of

Alkermes between April 22, 1999 and July 1, 2002 (the "Class Period"), against Alkermes and certain

of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.     Alkermes is a biopharmaceutical company focused on the development of controlled release drug delivery technologies and their application to existing or new drug therapies. Among the drug delivery technologies Defendants seek to develop are sustained-release systems based on biodegradable polymeric microspheres, including those based on Medisorb polymers.

3.     To demonstrate that the Medisorb-based technology had come of age, Defendants signaled, at the very beginning of the Class Period, the achievement of an important milestone. Defendants announced that, despite a variety of challenges, they had succeeded in the development and scale-up of current Good Manufacturing Practices ("cGMP") production, using the Medisorb technology, of pivotal clinical lots for an important product candidate for the treatment of schizophrenia, Risperdal Consta.

4.     During the Class Period, Defendants assured investors of the promise of its Medisorb polymeric sustained-release delivery technology as an approach to improve the safety, tolerability and adverse effects of new or existing drugs. Defendants distinguished their sustained-release drug delivery system from oral formulations, pointing to several and certain serious concerns that were known to exist with the current tablet and oral-solution formulations, including anxiety, drowsiness, uncontrolled tremors and muscle stiffness, dizziness, constipation, nausea, upset stomach, runny nose, rash, and rapid heartbeat.

5.     During the Class Period, Defendants further assured investors that the deal Defendants made with Risperdal Consta joint venture partner JPI Pharmaceutical International ("Janssen") would be profitable to the Company, particularly since an agreement had been negotiated to secure, aside

2

from the anticipated royalties and manufacturing payments under previous agreements, certain guaranteed financial payments and arrangements to eliminate significant financial risks.

6.      During the Class Period, Defendants artificially inflated the price of Alkermes shares by issuing a series of materially false and misleading statements about the Company's New Drug Application ("NDA") for Risperdal Consta.

7.      The true facts, which were known by each of the Defendants during the Class Period but were concealed from the investing public, were as follows:

(a)     In an attempt to decrease development expenses and speed the product to market, Defendants concealed the deficient nature of the manufacturing process for Medisorb polylactide-glycolide ("PLGA") polymer used to manufacture Risperdal Consta, resulting in quality management issues and delays in the development program;

(b)     In order to conceal lot-to-lot variations resulting from the manufacturing process for Medisorb polymer, Defendants minimized process development and validation requirements, including the establishment of specifications and analytical tests necessary to control those variations;

(c)     Significant quality issues for the manufacture of Risperdal Consta existed at the Wilmington, Ohio facility, impacting the ability of the Company to meet clinical development timelines for Risperdal Consta;

(d)     In order to avoid disclosure of the serious deficiencies of the Medisorb manufacturing process, particularly the lot-to-lot variation in molecular weight for Medisorb polymer, and in order to find a way to fix the desired molecular weight of the Risperdal Consta finished drug

3

product, Defendants patented a method to degrade the finished product to the desired molecular weight;

      (e)     Defendants' revenue projections for Risperdal Consta were grossly inflated based on Defendants' concealment of the fact that Risperdal's adverse effects and safety or tolerability issues worsen when Risperdal is formulated using Medisorb technology and used as intended;

      (f)     Defendants concealed that due to the combined effect of the financial agreements reached with its joint venture partner, Janssen, Risperdal Consta would not be profitable unless it achieved the high end of sales projections, an unlikely outcome because of the worsening of Risperdal's adverse effects and safety or tolerability issues when the drug is formulated using Medisorb technology and used as intended;

      (g)     The serious safety concerns for Risperdal "oral" and Risperdal Consta "depot" products, such as cerebrovascular effects in elderly patients, extrapyramidal symptoms, QT interval prolongation and diabetes, which were detected in clinical trials that went unreported to worldwide regulatory authorities for long periods, in some cases for studies completed well before the beginning of the Class Period, were negatively impacting the regulatory review process;

      (h)     For one or more reasons related to the known but unmet manufacturing, safety or efficacy requirements for the drug, the NDA for Risperdal Consta would not be approved on July 1, 2002; and

      (i)     The failure to disclose the defective nature of the Risperdal Consta chemical and manufacturing controls, clinical program, safety and other issues preventing the Company from

4

realizing product approval would prevent investors from learning the extent of the misrepresentations made to them during the Class Period.

8.    As a result of the Defendants' false statements, Alkermes stock traded at inflated prices during the Class Period, increasing to as high as $70.06 on February 16, 2000, whereby the Company sold $200 million worth of its own securities.[1]

9.    On July 1, 2002, Defendants announced the receipt of a non-approvable letter for Risperdal Consta. As a result of this announcement, Alkermes' stock price dropped precipitously over the next two days to a low of $4.04, or a loss of 93% from its Class Period high of $98 per share, on total volume of 29 million shares.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and Alkermes conducts business in this District.

---

[1] All share and per-share amounts have been adjusted for Alkermes' 2-for-1 stock split in May 2000.

13.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

14.    Plaintiff James P. Slavas purchased Alkermes common stock as described in the attached certification and was damaged thereby.

15.    Defendant Alkermes is a biopharmaceutical company focused on the discovery, development and commercialization of new small molecule drugs for the treatment of cardiovascular diseases. During the Class Period, Defendants caused the Company to sell $200 million worth of its securities.

16.    Defendant Richard F. Pops ("Pops") was Chairman and CEO of Alkermes. During the Class Period, Pops sold 663,312 of his Alkermes shares, for net proceeds of $20.3 million.

17.    Defendant Robert A. Breyer ("Breyer") was President of Alkermes until December 2001 and is a director of the Company. During the Class Period, Breyer sold 522,375 of his Alkermes shares, for net proceeds of $14.7 million.

18.    Defendant David A. Broecker ("Broecker") was Chief Operating Officer of Alkermes.

19.    Defendant Michael J. Landine ("Landine") was Vice President of Corporate Development and a former CFO of Alkermes. During the Class Period, Landine sold 183,500 of his Alkermes shares, for net proceeds of $5.4 million.

20.    Defendant James M. Frates ("Frates") was Vice President, Chief Financial Officer and Treasurer of Alkermes. Defendant Frates managed Finance, Intellectual Property, Investor Relations

and Human Resources. In addition, he oversaw the pending acquisition of Reliant Pharmaceuticals, as well as Alkermes' $200 million convertible bond issue. During the Class Period, Frates sold 86,000 of his Alkermes shares, for net proceeds of $2.8 million.

21.    Defendant James L. Wright ("Wright") was Senior Vice President, Research and Development of Alkermes. During the Class Period, Wright sold 5,000 of his Alkermes shares, for a net proceeds of $164,000.

22.    Defendants Pops, Breyer, Broecker, Landine, Frates, and Wright together, are referred to herein as the "Individual Defendants."

23.    During the Class Period, the Individual Defendants, as senior executive officers and directors of Alkermes were privy to confidential and proprietary information concerning Alkermes, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Alkermes as discussed in detail below. Because of their positions with Alkermes, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Alkermes' business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As a senior executive officer and a director and as a controlling person of a publicly-traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and which was traded on the Nasdaq and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Alkermes' financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Alkermes' common stock would be based upon truthful and accurate information. The

8

Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Alkermes' common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Alkermes' business, operations, and management and the intrinsic value of Alkermes common stock and caused Plaintiff and the other members of the Class to purchase Alkermes' common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

28.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased the securities of Alkermes during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alkermes common shares were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records

maintained by Alkermes or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the Class, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Alkermes; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### BACKGROUND AND OVERVIEW

10

**About the Company and the Drug**

34.    Defendant Alkermes is a biopharmaceutical company focused on the development of controlled release drug delivery technologies and their application to existing or new drug therapies. The Company's NDA for Risperdal Consta (depot product, depot formulation) for the treatment of schizophrenia has been filed at the FDA. Risperdal (Risperidone) belongs to a class of compounds referred to as atypical antipsychotics, used in the treatment of schizophrenia. If approved by the FDA, Risperdal Consta would represent the first example of a sustained release or "depot" formulation for biweekly administration, to mitigate patient compliance issues.

35.    The Risperdal Consta development effort is the result of a partnership between Medisorb Technologies International L.P. ("MTI") and Janssen. MTI entered into a development agreement with Janssen on or about December 23, 1993. Alkermes acquired the Risperdal Consta development program through the acquisition of MTI by its Alkermes Controlled Therapeutics Inc. II ("ACT II") subsidiary in 1996. The original development agreement was followed by two licensing agreements signed on or about February 21, 1996. The original development agreement was then amended on or about March 8, 1997 ("Second Amendment"). A definitive Manufacturing and Supply Agreement ("Mfg. Agreement") for a depot formulation of Risperidone was established on or about August 6, 1997. Other amendments and agreements occurred between the parties during the Class Period.

36.    Within the Mfg. Agreement of 1997 are certain terms between the parties to address the responsibilities of the parties, including forecasting for the development and commercial production of Risperidone a "Manufacturing Readiness Plan" by which Alkermes would commit such resources

11

and undertake such maintenance and training programs as needed to keep ACT II manufacturing facilities in a state of readiness for commercial manufacture of Risperidone. The 1997 Mfg. Agreement also covers quality and regulatory considerations, including the preparation and filing of a facilities Drug Master File ("DMF") with respect to the facilities where ACT II would manufacture the product and polymers.

37.     The submission of a DMF is not required by law. A DMF is sometimes submitted to the FDA as a tool to protect confidential and detailed information about facilities, processes, or articles used in the manufacturing, processing, purchasing, and storing of drug products. DMFs allow a party other than the DMF holder to reference materials without disclosing to that party the contents of the file. The result is the maintenance of the confidentiality of the contents to the DMF holder. The FDA will typically not review the substantive elements of the DMF until it is ready to review the IND, NDA or other application referencing the DMF.

38.     Schizophrenia is a chronic, severe and disabling brain disease. Deterioration of brain matter can sometimes be detected or measured, and is particularly profound in children with early onset of the disease, affecting verbal memory, attention, reasoning, aggression, and meaningful speech. According to the National Institute of Mental Health, approximately 1% of the world population suffers from schizophrenia in any given year. This suggests that as many as 2 million people in the United States are affected. Schizophrenia can be difficult to diagnose, but is usually manifested in a variety of so-called positive and negative symptoms. Positive symptoms are usually manifested as hallucinations or delusions that distort a person's sense of reality, often leading to paranoia. Negative symptoms are usually manifested as forms of isolation or withdrawal accompanied by poor personal hygiene or

12

general lack of motivation. Combinations of positive and negative symptoms are possible, resulting in a diagnosis of manic or bipolar disorders.

39.    The goal of a successful drug to treat schizophrenia is to inhibit and eliminate the mental, emotional, and behavioral disturbances associated with the disorder, with minimal side effects. Risperidone (Risperdal, 3-[2-[4-(6-Fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]ethyl] -6,7,8,9-tetrahydro-2-methyl-4H-pyrido[1,2-a]pyrimidin-4-one) is a so-called "atypical" antipsychotic, a term reserved for the subclass of drugs having prominent antiserotonergic (5-HT2) as well as antidopaminergic (D2) and antihistaminic (H1) activities.

40.    Risperdal Consta is a white powder made from Risperidone and 7525 DL JN1 poly-(d,l-lactide-co-glycolide) Medisorb polymer. The designation 7525 means that the polymer is composed of lactide (A) and glycolide (B) units in a 75/25 ratio, in a random (unknown) sequence of "A" and "B" units. Polymers composed exclusively of A or B units have much slower rates of hydrolysis than polymers composed of mixtures of A and B units. Risperdal Consta is made by a combination of patented and proprietary processes that dissolve the Medisorb polymer, mix into it the Risperidone drug, and finally precipitate the polymer in the form of "microspheres." The microspheres are formed and processed in a sterile environment, whereby a known amount of powder is deposited in clean sterile vials. Critical to the process are methods to obtain the proper particle size of the microspheres and the uniform distribution of the drug in the polymer. Biweekly depot dosage forms currently available ex-U.S. include 25 mg, 37.5 mg and 50 mg. The 25 mg dosage form appears to be equivalent to a 2 mg oral dose.

13

41.    According to ex-U.S. consumer information for the drug, Risperdal Consta is to be stored and used in the following manner: First, vials containing Risperdal Consta should be refrigerated at all times prior to use. To administer Risperdal Consta, the powder is diluted with an aqueous injection vehicle using a needle and syringe. The contents of the vial are shaken until a suspension is formed, appearing thick and milky in color. The entire contents of the vial is withdrawn, an appropriate needle is employed, air bubbles removed and, by application of proper technique, the entire contents of the syringe are injected intramuscularly into the buttock of the patient.

42.    The release of Risperdal from the Risperdal Consta drug product may be described by an "in vivo release profile," the manner by which the drug entrapped in the Medisorb polymer matrix is released once the microspheres have been injected into the patient. For example, if the release profile demonstrates a "burst effect," releasing too much of the drug into the patient within a 24-hour period, the patient might experience an extremely high dose of the drug, followed by a lower linear release over time. Alternatively, the release profile could be sigmoidal in nature, characterized by an initial lag in the release of the drug from the Medisorb polymer matrix, followed by a steep intermediate release phase, and ending in a flat final release phase. The Defendants have a patented technology that they may employ to control the in vivo release profile, as illustrated by the following in vitro cumulative drug release plot of Risperidone from Medisorb polymer, as a percent of total drug released from the microparticles (microspheres), as determined at specific timepoints.

**Safety of Risperdal Consta**

43.    The degree to which advantages with sustained or extended release drug formulations are realized is determined in part by safety considerations, including the ability to discontinue patient

14

treatment when serious drug-related side effects are observed or when other critical medications capable of drug-drug interactions must be administered.

44.    Alkermes reassured investors by explaining the advantages of and experience it has with its ProLease and Medisorb sustained-release drug delivery technologies on its Web site:

> ProLease® and Medisorb® Injectable Sustained-Release Drug Delivery Systems
>
> Alkermes® has developed two uniquely complementary platforms for drug delivery: ProLease and Medisorb injectable sustained-release technologies for both small and macromolecules. With release profiles lasting from days to months, each is designed to eliminate the need for frequent dosing.  Each has the potential to:
>
> ● Improve patient compliance and convenience by reducing dosing frequency
>
> ● Improve safety and tolerability
>
> ● Reduce adverse effects associated with peak/trough levels of other (oral) dosage forms
>
> ● Commercialize products that would otherwise not be viable because of delivery or economic considerations
>
> ● Optimize product lifecycle management
>
> The advantages are clear.
>
> Each technology supports a broad array of applications and offers customizable release profiles lasting from days to months.
>
> Alkermes has refined outstanding expertise in the kinetics of controlled release by generating predictable in vivo performances and clinically proven formulations.

With established commercial manufacturing facilities and all encompassing development infrastructure, Alkermes solidifies its position as a market leader in injectable sustained-release.

Alkermes' commitment to innovation brings product concepts to realization.

45.     When the oral dosage form can cease to be administered or the dosage unit can be readily removed from the patient, as in the case of a transdermal patch, safety issues can be more readily addressed. When the formulation is designed as an implanted biweekly sustained-release dosage form, utilizing Medisorb polymer for sustained release of Risperdal, a drug known to Defendants as having significant and serious side effects, potentially life-threatening safety issues could result from Defendants' product design.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

46.     On April 22, 1999, Defendants issued a press release entitled "Alkermes and Janssen Pharmaceutica to Proceed into Phase III Clinical Trials of Sustained Release Formulation of Anti-Psychotic Drug Risperdal®." The press release stated in part:

Alkermes, Inc. announced today that Janssen Research Foundation, a division of Janssen Pharmaceutica, will proceed into Phase III clinical trials of an IM injectable sustained release formulation of the anti-psychotic drug RISPERDAL® (risperidone). The product candidate is based on Alkermes' Medisorb® drug delivery system and is designed to provide patients with prolonged therapeutic benefit from a single administration. The decision to proceed into Phase III clinical trials follows the successful completion by Janssen of Phase I and Phase II clinical trials of the product candidate and the completion by Alkermes of scale-up and Phase III manufacturing activities at the expected commercial scale.

*"This is an important milestone in the development of this product candidate and of our Medisorb drug delivery*

16

*technology," said Richard F. Pops, Chief Executive Officer of Alkermes. "We have moved rapidly in the development and scale-up of this product candidate with our partners at Janssen Pharmaceutica. We look forward to the next phase of product development."*

47.    Defendants concealed the fact that the Medisorb facilities were comprised of two parts: the research and development operations in the "Blue Ash" facility located at 6954 Cornell Road in Cincinnati, Ohio, and the manufacturing facilities located approximately 35 miles north on Olinger Circle in Wilmington, Ohio.

48.    *While Defendant Pops announced the production of manufacturing lots at commercial scale, the Defendants concealed that the Wilmington facility was wholly unable to commence or maintain commercial scale operations for cGMP manufacture of Risperdal Consta or any other drug product.* As of the April 22, 1999 press release, the only DMF in existence, established on March 15, 1990, was for the manufacture of Medisorb polymer at the Blue Ash facility in Cincinnati, Ohio. No such document had ever been filed for the Wilmington, Ohio facilities for the production of Medisorb injectable sustained-release drug delivery systems. Nor have Defendants ever sustained a successful FDA pre-approval inspection in connection with the manufacture of any commercial drug products based on Medisorb sustained-release technology or in the Wilmington facilities.

49.    Defendants also concealed quality issues with the 7525 DL JN1 poly-(d,l-lactide-co-glycolide) Medisorb polymer used in the production of Risperdal Consta manufacturing lots. Defendants knew that a uniform process of manufacture of polymer, achieving control over important quality parameters such as molecular weight, was critical. The decision not to routinely conduct tests

17

for molecular weight on its Medisorb cGMP polymer lots concealed the fact that Medisorb polymer

production methods resulted in molecular weights with an unacceptably wide variation from lot to lot for

use in production of sustained-release drug delivery systems. Defendants knew at all times during the

Class Period that: (i) polymer molecular weight affects drug release characteristics; (ii) the molecular

weight of a polymer influences the biodegradation rate of the polymer; and (iii) polymer lot-to-lot

variations can influence the in vitro and in vivo release profiles of the drug within a polymer matrix. In

addition to the deficient state of the Wilmington manufacturing facilities, the April 22, 1999 press

release failed to disclose the inadequate nature of the manufacturing process and controls for cGMP

manufacture of Medisorb polymer lots that substantially contributed to the quality issues in the

manufacture of Risperdal Consta research and clinical supplies during the Class Period.

50.    In January 2000, Defendant Breyer sold 200,000 Alkermes shares, Defendant Frates

sold 8,000 Alkermes shares, Defendant Landine sold 99,000 Alkermes shares and Defendant Pops

sold 350,000 Alkermes shares at prices between $24.50 and $25.50 per share.

51.    On February 16, 2000, at a time when the Company's shares were already trading at

artificially inflated prices, the Company issued a press release entitled "Alkermes Announces Placement

of $200 Million in Convertible Subordinated Notes." The press release stated in part:

> Alkermes today announced the private placement of $200 million
> aggregate principal amount of its 3¼% Convertible Subordinated
> Notes due 2007. The offering, which was made through initial
> purchasers to qualified institutional buyers under Rule 144A under the
> Securities Act of 1933, is expected to close on February 18, 2000.
> Alkermes has also granted the initial purchasers of the notes an option
> to purchase up to an additional $50 million in principal amount of the
> notes. The notes are convertible into common stock of Alkermes at a
> conversion price of $135.50 per share, subject to adjustment in certain

18

circumstances. Alkermes has agreed to file a registration statement for the resale of the notes and the common stock issuable upon conversion of the notes within 60 days after the closing of the offering.

52.     News of the success of this critical financing reassured investors that the Company's

products were viable and that the investment banking community stood behind the Company's science.

Most importantly, as a result of this financial announcement, Defendants convinced investors that the

Company's success was assured, as shares increased nearly 90% in value in the days that followed the

announcement.

53.     On May 19, 2000, Defendants caused Application Ser. No. 09,575,075 to be filed

with the U.S. Patent and Trademark Office for the grant of a patent entitled "Method for Preparing

Microparticles Having a Selected Polymer Molecular Weight." Among the details describing the

preferred embodiments of the invention was the following statement explaining the key use of the

method:

> The methods of the present invention control the hold time and temperature of a polymer solution in order to control the molecular weight of the polymer in the finished microparticle product. In this manner, the methods of the present invention advantageously allow a selected polymer molecular weight to be achieved from a variety of starting material molecular weights. Alternatively, microparticle products of varying polymer molecular weights can be produced using the same molecular weight starting material. Thus, a range of products can be made from the same starting materials, thereby eliminating the need to reformulate the finished product to achieve the desired molecular weight of the polymer in the finished product.

54.     By seeking the approval of the patent application on made on May 19, 2000,

Defendants sought to demonstrate expertise in the field and the capacity to create valuable intellectual

property, while concealing a desperate need to identify product manufacturing methods to "fix" the

19

quality issues relating to wide variations in the quality of Medisorb polymer required for the manufacture of Risperdal Consta.

55.    Defendants knew that Medisorb PLGA polymers are actually composed of random (unknown) sequences of lactide (A) and glycolide (B) units, resulting in polymer strand regions with interspersed block (AB... AA... or BB...) sequences of unknown length. Defendants knew that degradation rates of PLGA polymers in solution have markedly different degradation rates, on the order of weeks or months, depending on the lactide/glycolide ratio, a fact critical to the polymer selection process and to the performance of a Medisorb sustained release PLGA based drug delivery system in vivo. Yet, despite Defendants' knowledge of the critical nature of the lactide/glycolide ratio on the performance of Medisorb technology, Defendants concealed the impact of the erosion process in the May 19, 2000 patent application, when applied to 75/25 Medisorb PLGA polymer having molecular weights ranging from 92 to 230 kiloDaltons (kD), on the lactide/glycolide ratio.

56.    Defendants' use of a manufacturing scheme that included either or both of patented methods, first to "erode" or "degrade" the Medisorb polymer in an organic solution of the polymer containing Risperdal, and secondly to control the "burst effect," would further complicate Defendants' efforts to achieve a cGMP compliant Risperdal Consta manufacturing process. The reason Defendants sought new patented and proprietary processes that would actually complicate the Risperdal Consta manufacturing process was so that they could continue their concealment of quality issues relating to variation in the manufacturing process for the Medisorb polymer. Defendants sought these complications even though they realized that they would create significant obstacles in achieving a

20

controlled manufacturing process capable of validation, a key requirement for FDA inspection activities necessary to demonstrate readiness for manufacture of the product in the Wilmington facility.

57.    In July 2000, Defendant Breyer sold 75,000 Alkermes shares, Defendant Frates sold 30,000 Alkermes shares, Defendant Landine sold 40,000 Alkermes shares and Defendant Pops sold 175,000 Alkermes shares at prices between $44.09 and $45.61 per share.

58.    In September 2000, Defendants' joint venture partner Janssen caused to be published a Review Article entitled "A Risk-Benefit Assessment of Risperidone for the Treatment of Behavioural and Psychological Symptoms in Dementia" ("Risk Assessment"). The article signaled the acceptability of the safety and efficacy profile of the drug for the treatment of dementia in the elderly. While the article was intended to disclose serious Risperdal side effects as part of a risk-benefit assessment, it actually concealed serious adverse cerebrovascular side effects ("CVAEs") in the elderly, contained in one or more Janssen studies cited as references to the article.

59.    From January 2001 through July 2001, Defendant Breyer sold 135, 000 Alkermes shares, Defendant Frates sold 20,000 Alkermes shares, Defendant Landine sold 18,000 Alkermes shares, Defendant Pops sold 55,000 Alkermes shares and Defendant Wright sold 5,000 Alkermes shares at prices between $22.00 and $34.65 per share.

60.    On or about August 1, 2001, Defendants executed an Addendum to the Mfg. Agreement of 1997 ("Wilmington Facility Agreement"). The intent of this agreement was to recognize and remedy the fact that the Wilmington manufacturing facilities for the Risperdal drug product were inadequate and unready to undertake the cGMP manufacture of Risperdal Consta based on increased sales forecasts, once the product would be approved:

ADDENDUM TO MANUFACTURING AND SUPPLY AGREEMENT

This Addendum to Manufacturing and Supply Agreement (this "Addendum"), dated as of the 1st day of August, 2001 (the "Effective Date") is by and between JPI PHARMACEUTICA INTERNATIONAL, a division of Cilag AG International Zug, a company duly organized and existing under the laws of Switzerland, having its principal office in CH-6300 Zug, Kollerstrasse 38, Switzerland ("JPI") and JANSSEN PHARMACEUTICA Inc., 1125 Trenton-Harbourton Road, Titusville, NJ 08560, USA ("Janssen US" and, together with JPI, "Janssen") on the one hand and Alkermes Controlled Therapeutics Inc. II, a company organized and existing under the laws of the Commonwealth of Pennsylvania, having its principal office at 64 Sidney Street, Cambridge MA 02139-4136, USA ("ACTII") on the other hand.

WHEREAS, Janssen and ACTII have been collaborating for the development of a Risperidone depot formulation incorporating ACTII's proprietary technology concerning bioabsorbable polymer technologies and have entered into a Development Agreement and two License Agreements related thereto; and

WHEREAS, Janssen and ACTII entered into that certain Manufacturing and Supply Agreement, dated August 6, 1997 (the "Supply Agreement"), with respect to the commercial manufacture and supply of such Risperidone depot formulation to Janssen; and

WHEREAS, Janssen and ACTII desire to enter into this Addendum regarding the expansion of ACTII's manufacturing facilities, and the financial responsibilities of each of the parties in connection with such expansion, in order to support the increased sales forecasts for such Risperidone depot formulation; and

WHEREAS, Janssen and ACTII further desire to enter into this Addendum to formally provide for a collaborative effort to develop the manufacturing facility and commercial supply of Product.

61.    Between August 1, 2001 and August 17, 2001, Defendant Landine sold 4,000

Alkermes shares, Defendant Frates sold 4,000 Alkermes shares, Defendant Pops sold 12,500

22

Alkermes shares and Defendant Breyer sold 12,000 Alkermes shares at prices between $26.46 and $27.92 per share.

62.    On September 4, 2001, the Company issued a press release entitled "New Drug Application for First Injectable, Long-Acting Atypical Antipsychotic Submitted to FDA." The press release stated in part:

> A new drug application for a long-acting injectable formulation of Risperdal® (risperidone)* has been filed with the Food and Drug Administration by Janssen Pharmaceutica Products, LP, and similar filings are now being submitted with health authorities worldwide. If approved, it would be the first atypical antipsychotic medication available in a formulation suitable for long-term use that requires administration just once every two weeks, instead of daily doses.
>
> Using proprietary Medisorb® technology developed by Alkermes, Inc., the new formulation encapsulates risperidone in "microspheres" made of a biodegradable polymer, which is injected into the muscle. Laboratory and clinical research has shown that the microspheres gradually degrade at a set rate designed to provide consistent levels of the drug in the bloodstream. The polymer from which the microspheres are made breaks down into two naturally occurring compounds that are then eliminated by the body. *Alkermes is scheduled to manufacture this long-acting formulation of Risperdal pending regulatory approval.*
>
> Risperdal tablets, first introduced in the United States in 1994, have become the most widely prescribed atypical antipsychotic in the world, and the most commonly used antipsychotic of any type in the United States. It is indicated for the management of psychotic symptoms, such as those associated with schizophrenia – a brain disorder that affects about 1-2 percent of the world's population (including 2 million Americans). Older, conventional antipsychotics have been available in longer-acting, injectable formulations, which have been associated with significant side effects.
>
> In its current tablet and oral-solution formulations, Risperdal has been shown in clinical trials to be effective and generally well

23

tolerated. However, as with all antipsychotic medications, it was associated with side effects. In two controlled trials, adverse events that occurred in at least 5 percent of patients receiving Risperdal and were experienced at least twice as often as those taking placebo were anxiety, drowsiness, extrapyramidal symptoms (uncontrolled tremors and muscle stiffness), dizziness, constipation, nausea, dyspepsia (upset stomach), rhinitis (runny nose), rash and tachycardia (rapid heart beat). While dose-dependent, extrapyramidal symptoms typically occur at a rate that is comparable to that seen with placebo at doses less than or equal to 6 mg per day taken orally.

63.    By signaling to investors in the September 4, 2001 press release that the Company stood ready to manufacture Risperdal Consta, Defendants concealed the reasons for the August 1, 2001 Wilmington Facility Agreement and that the Wilmington facilities were in fact unable to begin commercial manufacture of the product at the expected levels.

64.    Defendants' disclosure in the September 4, 2001 of the fact that all antipsychotic medications have been associated with side effects was false and misleading. In raising such broad-based concerns about antipsychotic medications, including longer-acting injectable formulations of conventional antipsychotics, Defendants sought to conceal the special safety concerns that would accompany the use of Risperdal when formulated using Medisorb technology for sustained release. To note these special safety concerns would have differentiated the Medisorb-based depot product on the basis of safety, dramatically increasing concerns about product marketability, particularly in special populations, as well as for safe use in treating behavioural and psychological symptoms detailed in the false and misleading Risk Assessment article. These concerns would also have contradicted Defendants' claims of the "clear advantages" resulting from the application of Medisorb technology posted on Defendants' Web site:

24

ProLease® and Medisorb® Injectable Sustained-Release Drug Delivery Systems

Alkermes® has developed two uniquely complementary platforms for drug delivery: ProLease and Medisorb injectable sustained-release technologies for both small and macromolecules. With release profiles lasting from days to months, each is designed to eliminate the need for frequent dosing. Each has the potential to:

- Improve patient compliance and convenience by reducing dosing frequency

- Improve safety and tolerability

- Reduce adverse effects associated with peak/trough levels of other (oral) dosage forms

- Commercialize products that would otherwise not be viable because of delivery or economic considerations

- Optimize product lifecycle management.

The advantages are clear.

Each technology supports a broad array of applications and offers customizable release profiles lasting from days to months.

Alkermes has refined outstanding expertise in the kinetics of controlled release by generating predictable in vivo performances and clinically proven formulations.

With established commercial manufacturing facilities and all encompassing development infrastructure, Alkermes solidifies its position as a market leader in injectable sustained-release.

Alkermes' commitment to innovation brings product concepts to realization.

65.     On September 4, 2001, Defendant Pops sold 7,812 Alkermes shares at $25.88 per share, and between October 24, 2001 and October 25, 2001, Pops sold 12,500 Alkermes shares at $25.01-$26.05 per share.

66.     On September 4, 2001, Defendant Landine sold 2,500 Alkermes shares at $25.88 per share, and between October 24, 2001 and October 25, 2001, Landine sold 4,000 Alkermes shares at $25.01-$26.05 per share.

67.     Between September 4, 2001 and September 28, 2001, Defendant Frates sold 4,000 Alkermes shares at $20.01-$25.88 per share and between October 3, 2001 and October 24, 2001, Frates sold 4,000 Alkermes shares at $20.53-$25.01 per share.

68.     On September 4, 2001, Defendant Breyer sold 7,500 Alkermes shares at $25.88 per share and between October 11, 2001 and October 25, 2001, Breyer sold 12,000 Alkermes shares at $22.67-$26.05 per share.

69.     On October 30, 2001, the Company issued a press release entitled "Alkermes to Expand Production Facility to Meet Projected Demand for Long-Acting Formulation of Risperdal." The press release stated in part:

> Alkermes, Inc. today announced the signing of an agreement with Janssen Pharmaceutica that provides for the expansion of Alkermes' manufacturing capacity for production of the new, long-acting injectable formulation of Risperdal® (risperidone). A new drug application (NDA) for the new formulation of Risperdal, currently the most widely prescribed antipsychotic medication in the United States, was submitted to the U.S. Food and Drug Administration on August 31, 2001. Risperdal is expected to be the first "atypical" antipsychotic to be available in a formulation that only requires administration every two weeks.

26

"Our current manufacturing facility is fully equipped to support launch quantities and to meet the early demand projected for long-acting Risperdal," stated David Broecker, Chief Operating Officer of Alkermes. "This expansion will include the construction of a separate, large-scale GMP facility on the same site and is designed to enable Alkermes to significantly expand our production capacity. Our agreement with Janssen eliminates the financial risk associated with the acceleration of this expansion."

Pursuant to the agreement announced today, Alkermes has committed to expand its production capacity prior to FDA approval of the new Risperdal formulation in exchange for certain guaranteed financial payments. In addition, Alkermes will receive, under earlier agreements, royalties and manufacturing payments from Janssen upon successful commercialization of the new, long-acting Risperdal.

The long-acting formulation of Risperdal uses Alkermes' proprietary, injectable sustained-release drug-delivery technology, Medisorb®. The technology is based on the encapsulation of drugs into small polymeric microspheres that degrade slowly and release the medication at a controlled rate following subcutaneous or intramuscular injection. Alkermes is developing Medisorb product candidates in collaboration with pharmaceutical and biotechnology companies and on its own.

70.    Nearly three months had elapsed between the signing of the Wilmington Facility

Agreement and Defendants' announcement in the October 30, 2001 press release. Despite the claims

in the press release regarding the ability of the Wilmington manufacturing facilities to produce launch

quantities and meet the early demand projected for the Risperdal Consta once the FDA approved the

NDA, Defendants again concealed the fact that the only DMF in existence for the MTI facilities,

established on March 15, 1990, was for the manufacture of Medisorb polymer at the Blue Ash facility

in Cincinnati, Ohio. No such document had ever been filed for the Wilmington, Ohio facilities for the

production of Medisorb® injectable sustained-release drug delivery systems. Nor have Defendants

27

ever sustained a successful FDA pre-approval inspection in connection with the manufacture of commercial drug products in the Wilmington facilities. While a facilities DMF was not required under FDA regulations, the Defendants were still required to produce and file one, by Janssen, under the 1997 Mfg. Agreement. Thus, despite assertions to the contrary in the October 30, 2001 press release, Defendants remained wholly unable to begin commercial manufacture of the product at the expected levels.

71.    The October 30, 2001 press release regarding the elimination of the financial risk associated with the Wilmington Facility Agreement was false and misleading since it failed to point out that: (i) the costs of the project are to be borne exclusively by the Defendants, and not by Janssen, unless Janssen terminates the development program; (ii) after commercialization, the costs of the project come out of Defendants' royalty revenue, unless sales of the product fall below some minimum revenue amount; and (iii) Defendants separately and egregiously accounted for the royalties and manufacturing payments from Janssen in connection with sales of the product as an additional source of revenue, as if these payments were wholly unconnected with the terms of the Wilmington Facility Agreement.

72.    Between November 1, 2001 and February 26, 2002, Defendant Landine sold 16,000 Alkermes shares, Defendant Frates sold 16,000 Alkermes shares, Defendant Breyer sold 54,000 Alkermes shares and Defendant Pops sold 50,000 Alkermes shares at prices between $24.23 and $28.27 per share.

73.    On February 26, 2002, the Company issued a press release entitled "Poster Titled 'Maintenance of Efficacy Without Compromising Safety When Switching From Oral Risperidone to

28

Risperdal Consta®, a Long-acting Injection Formulation of Risperidone' Posted on Alkermes' Web

Site." The press release stated in part:

> Alkermes, Inc., today announced that it added a poster to its website
> entitled "Maintenance of Efficacy Without Compromising Safety When
> Switching from Oral Risperidone to Risperdal Consta®, a Long-acting
> Injection Formulation of Risperidone." The poster was presented
> today, Tuesday, February 26, 2002 at 12:30pm ET at the Winter
> Workshop on Schizophrenia in Davos, Switzerland. This poster
> demonstrates the maintenance of efficacy without compromising safety
> when switching from Risperdal® (risperidone) tablets to Risperdal
> Consta. The poster is available on the Alkermes website at
> www.alkermes.com/news.

> A new drug application (NDA) for Risperdal Consta was
> submitted to the U.S. Food and Drug Administration on August 31,
> 2001 by Johnson & Johnson Pharmaceutical Research &
> Development, which conducted the clinical-development program. If
> approved by the FDA, Risperdal Consta will be marketed in the United
> States by Janssen Pharmaceutica Products, LP and manufactured by
> Alkermes. Risperdal is currently the most widely prescribed
> antipsychotic medication in the United States and would be the first
> "atypical" antipsychotic to be available in a long-acting formulation.
> Risperdal Consta is a long-acting injectable formulation of Risperdal
> that uses Alkermes' proprietary, injectable sustained-release drug
> delivery technology, Medisorb®. The technology is based on the
> encapsulation of drugs into small polymeric microspheres that degrade
> slowly and release the medication at a controlled rate following
> subcutaneous or intramuscular injection. Alkermes is developing
> Medisorb product candidates in collaboration with pharmaceutical and
> biotechnology companies and on its own.

74. The Defendants knew that the press release of February 26, 2002 stating that the use

of Risperdal Consta does not compromise patient safety was false and misleading, since the Risperdal

Consta dosage form cannot not be removed once injected and there is no way to discontinue delivery

of the drug in patients once they are afflicted with adverse side effects, whether or not they had already

used oral Risperdal.

75.    On March 21, 2002, the Company issued a press release entitled "Alkermes and

Reliant Pharmaceuticals Announce Merger." The press release stated in part:

> Alkermes, Inc. and Reliant Pharmaceuticals, LLC ("Reliant") today
> announced that the Board of Directors of Alkermes and the Board of
> Managers of Reliant have each unanimously approved a definitive
> merger agreement between the two companies. The merger unites
> Reliant's three marketed product brands, product development
> pipeline, extensive U.S. sales and marketing infrastructure and
> management team with Alkermes' advanced drug formulation and
> development capabilities, pipeline of proprietary and partnered
> products and manufacturing capabilities to create a rapidly growing
> integrated pharmaceutical company.
>
> The transaction is structured as a tax-free exchange of equity, in
> which non-Alkermes equity holders of Reliant will receive a total of
> 31.07 million shares of Alkermes stock or approximately 31% of the
> outstanding shares of the new company post-closing. Based upon the
> March 20, 2002 closing market price for Alkermes of $30.05 per
> share, the purchase price for the portion of Reliant not already owned
> by Alkermes is $934 million.

### THE TRUTH IS REVEALED

76.    On July 1, 2002, the Company issued a press release entitled "Alkermes Announces

Receipt by Johnson & Johnson Pharmaceutical Research & Development of Non-Approvable Letter

for Risperdal Consta." The press release stated in part:

> Alkermes, Inc. today announced that Johnson & Johnson
> Pharmaceutical Research & Development, LLC has received a non-
> approvable letter from the U.S. Food and Drug Administration (FDA)
> related to its New Drug Application (NDA) for Risperdal Consta(TM)
> (risperidone) long-acting injection.

30